(No. 34720.—

THE CITY OF CHICAGO, Appellant, *vs.* ILLINOIS COMMERCE
COMMISSION *et al.,* Appellees.

*Opinion filed September 18, 1958—Rehearing denied Nov. 14, 1958.*

JOHN C. MELANIPHY, Corporation Counsel, of Chicago, (JOSEPH F. GROSSMAN, EDWARD V. HANRAHAN, and J. J. DANAHER, of counsel,) for appellant.

LATHAM CASTLE, Attorney General, of Springfield, and H. R. BEGLEY, of Chicago, (ELMER M. WALSH, JR., of counsel,) for appellee Illinois Commerce Commission; and WILLIAM J. O'BRIEN, JR., and ERLE J. ZOLL, JR., both of Chicago, (JOSEPH H. WRIGHT, HERBERT J. DEANY, and ROBERT S. KIRBY, all of Chicago, of counsel,) for appellee Illinois Central Railroad Company.

Mr. JUSTICE HOUSE delivered the opinion of the court:

This is an appeal from a judgment of the superior court of Cook County confirming an order of the Illinois Commerce Commission authorizing the Illinois Central Railroad Company to file a new tariff for its suburban service, increasing the minimum one-way fare from 22 cents to 25 cents and increasing all other suburban fares by 15 per cent. The appellant, city of Chicago, complains of the order in so far as it authorizes an increase in rates for travel between stations within the city.

This proceeding was initiated on March 15, 1956, when the Illinois Central filed a tariff with the Illinois Commerce Commission seeking authorization to increase its minimum fare to 30 cents and its other suburban fares 36 per cent. The commission suspended the operation of the tariff and ordered hearings thereon. The Illinois Central then filed a petition with the Interstate Commerce Commission alleging that the suspension order of the Illinois Commerce Commission caused the continued maintenance of fares so low that they constituted a violation of the Interstate Commerce Act. The Interstate Commerce Commission instituted an investigation and extensive hearings were held jointly by examiners of the two commissions.

The city of Chicago and a group of suburbs served by the suburban operation south of the city limits intervened in the hearings and all parties filed briefs. A joint proposed report was issued by the two examiners, following which briefs of exceptions and replies thereto were filed. Each commission then heard oral arguments. On March 6, 1957, the two commissions simultaneously released their decisions approving the 15-per-cent increase. The Illinois commission issued an order authorizing the increase, but the interstate commission issued no order since no affirmative order by it was necessary under the circumstances.

On April 30, 1957, the city of Chicago, its petition for rehearing before the Illinois commission having been denied, appealed the Illinois commission's order to the superior court of Cook County. That court on December 11, 1957, entered its judgment confirming the order.

The evidence shows that the Illinois Central operates an electric train system within Cook County, from Randolph Street Station in Chicago, on the north, to Richton, Blue Island, and South Chicago, on the south. A part of this operation is within the city of Chicago and a part is south of the city limits.

The principal contention of the city is that the Illinois Central's present rate structure unjustly discriminates against passengers riding between stations within the city of Chicago. Under our holdings the city had the burden of proving this. (*Produce Terminal Corp.* v. *Commerce Com. ex rel. Peoples Gas Light and Coke Co.* 414 Ill. 582; *Chicago and Eastern Illinois Railway Co.* v. *Commerce Com. ex rel. Cairo Ass'n of Commerce,* 343 Ill. 117.) The commission found that the contention was not sustained by the evidence and the city urges that this finding is erroneous.

Finding the effect of a rate structure, such as we have here, is an extremely involved and a highly technical matter and calls for the evaluation of intricate evidence based

in part upon calculated assumptions. Thus, a finding as to the effect of rates by the commission, which has expert knowledge and much experience in this matter, will not be disturbed unless it is against the manifest weight of the evidence. Ill. Rev. Stat. 1957, chap. 111⅔, par. 72; *Produce Terminal Corp.* v. *Commerce Com.* 414 Ill. 582; *State Public Utilities Com. ex rel. East St. Louis Stone Co.* v. *Terminal Railroad Ass'n of St. Louis,* 281 Ill. 181.

The city contends that the actual riding habits of the passengers proves the discriminatory nature of the Illinois Central fare structure in that riders to and from stations outside the city found it so economically advantageous to use multiple-ride and commutation tickets that they paid slightly more than half the maximum potential fares for their rides, resulting in a $570,000 loss to the Illinois Central; while, in contrast, riders between stations within the city, found slight economic advantage in the use of multiple-ride and commutation tickets and paid almost the maximum potential fares for their rides, resulting in an $810,000 profit to the Illinois Central.

To support its contention the city introduced a cost study wherein the Illinois Central's revenues and expenses for the year 1955 were allocated to its operations within the city and to its operations outside the city. This study, which the city alleges follows the pattern of a cost study made by the Illinois Central in its 1951 rate case before the Illinois commission, was developed wholly from figures submitted by the Illinois Central in its exhibits received in evidence in this proceeding but which did not make any allocation between within-the-city and outside-the-city operations. The city's cost study shows: (1) that the predominant element in the Illinois Central's cost of operations varied with the length of haul and (2) that its operations within the city resulted in a profit of approximately $810,000, while its operations outside the city resulted in a loss of approximately $570,000.

An important feature of rate schedules of carriers is that distance rates are constructed on the diminishing progression principle, that is, rates increase with distance, but the rate of increase becomes less as distance increases. Distance rates are constructed on this principle because the cost of service to the carrier decreases as distance increases and because if rates increased in proportion to distance they would soon become so high as to prevent the movement of traffic. See D. Philip Locklin, "Economics of Transportation."

The city in its brief states that it does not quarrel with the use of a tapering fare structure under proper conditions, but that in this case the tapering is too sharp because it produced in 1955 a deficit of about $570,000 for operations outside the city and a profit of about $810,000 for operations inside the city. It argues that, before rates for travel between stations within the city are increased, the rates for outside-the-city travel be raised to a point where the outside-the-city operations will be compensatory to the Illinois Central.

The commission, in commenting on the city's cost study, stated: "The City urges that such study establishes an unjust discrimination. However, there are many costs which are unrelated to distance which must be considered in determining fares and the relation between fares in an operation such as is performed by Respondent. On a suburban line handling a peak load into the downtown area in the morning and out of the downtown area in the evening with considerable idle time for both crews and equipment with empty hauling and storage of the latter during the off-peak hours, it is the number of passengers, as well as the passenger miles which determines the number of trains, cars and crews required. The service per passenger mile diminishes with increasing distance much more rapidly in the case of commuter service than in the case of travel under the basic or multiple fares." Thus, the commission did not feel that

the city's cost study properly reflected the costs inside the city and outside the city.

The city does not deny that there are many costs unrelated to distance which must be considered in determining fares in an operation such as is performed by the Illinois Central, rather it argues that there is no evidence in the record relating to such other factors and the commission can only make a finding based on evidence in the record. It must be remembered that the present rate structure of the Illinois Central was established in a previous proceeding. At that time the Illinois Central had the burden of proposing rates that were just, reasonable and nondiscriminatory. This it presumably did and the present fare structure went into effect. Changed conditions could make this rate structure unreasonably discriminatory against riders travelling between stations within the city, but the burden, as we have indicated, is now upon the city to prove this unjust discrimination. It was not necessary for the Illinois Central to introduce evidence that the present fare structure is still just, reasonable and nondiscriminatory nor was it necessary that it discredit the city's evidence on this point. The question then is whether the commission had to accept the city's cost study at face value. One of the very functions of the commission is to evaluate the evidence before it. Drawing on its expert knowledge and great experience in these matters it found that the city's cost study could not be given the weight the city gave it because it did not properly reflect costs inside and outside the city. The commission is not bound to accept as true all evidence not rebutted especially when, as in this case, the commission knows that costs unrelated to distance exist and must be considered to arrive at an accurate cost study. The commission's finding that there is no "undue or unreasonable discrimination in the general plan of the present fare structure" is equivalent to a finding that there was not sufficient evidence to prove undue or unreasonable discrimination in

the general plan of the present fare structure, which is based in this case, anomalously but properly, upon the lack of evidence by the city in the record.

The city argues that these costs unrelated to distance were not considered in arriving at the proposed tariff and that it was developed by nothing more than a mathematical computation of what fare would give the Illinois Central the amount of money it felt necessary. The Illinois Central in this proceeding was not attempting to readjust rates between certain stations or sections of its suburban system. It was merely seeking to increase its revenue by raising its rates in such a manner that the existing rate would remain the same except that it would be uniformly raised by a certain percent. Since the rate structure was to be maintained except as increased by a uniform proposed 36 per cent, it was unnecessary to consider these costs that are unrelated to distance. A uniform given percentage increase is the very antithesis of discrimination.

The city argues that in spite of its cost study the commission found that the Illinois Central had an *income* of approximately $570,000 from its operations to and from stations outside the city, and that the invalidity of this finding renders the entire order void. The commission in its order opened its discussion regarding the city's cost study by saying: "The City's main contention is directed at the schedule of fares which allows a gradual diminishing per mile rate for the longer suburban haul. The City introduced a cost study to show that on the basis of cost accounting the Respondent had an income from its operations to and from stations outside the City, i.e. south of 130th Street on the Main Line and Racine Avenue on the Blue Island branch, of approximately $570,000. The city urges that such study establishes an unjust discrimination."

What the commission was stating was the city's contention, not what it found to be the Illinois Central's cost of operations outside the city. It is obvious from a reading

of the entire paragraph that the commission understood the city's contention but by inadvertance the word "income" rather than "loss" was used. If the amount indicated would have been income (using the word "income" in the loose sense of profit) rather than a deficit from operations outside the city, the city's contention would have been meaningless. The error in using the obviously wrong word "income" in stating the city's contention is harmless in this case and, therefore, is not a ground for reversal of the commission's order.

We are of the opinion that the commission's findings are not contrary to the manifest weight of the evidence and that the judgment of the superior court should be affirmed. The judgment of the superior court affirming the order of the Commerce Commission is accordingly affirmed.

*Judgment affirmed.*