CITIZENS' UTILITY BOARD, Petitioner-Appellant, v. ILLINOIS COM-
MERCE COMMISSION *et al.*, Respondents-Appellees.—SANDRA WALDEN
*et al.*, Petitioners-Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.*,
Respondents-Appellees.—THE PEOPLE OF THE STATE OF ILLINOIS,
Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION *et al.*,
Respondents-Appellees.

Third District    Nos. 3—99—0944, 3—99—0949, 3—99—0965 cons.

Opinion filed August 2, 2000.—Modified on denial of rehearing
September 13, 2000.

KOEHLER, J., specially concurring.

Susan L. Satter (argued) and Robert J. Kelter, both of Citizens Utility
Board, of Chicago, for petitioner.

James E. Ryan, Attorney General, of Chicago (John P. Kelliher (argued),
Special Assistant Attorney General, of counsel), for respondent Illinois Com-
merce Commission.

John Rooney (argued), Michael Guerra, and Ross E. Kimbarovsky, all of Hopkins & Sutter, of Chicago, and Tracy Pagliara, of Irving, Texas, for respondent GTE North, Inc.

JUSTICE BRESLIN delivered the opinion of the court:

Petitioners Citizens' Utility Board (CUB), the People of the State of Illinois and several individual telephone service consumers appeal from a decision of the Illinois Commerce Commission (ICC) in a case petitioners initiated against GTE North, Inc. (GTE), a local telephone service provider. Petitioners alleged that GTE has implemented a rate scheme that discriminates against its rural consumers. As a remedy, petitioners sought an expansion of GTE's home calling areas in rural exchanges. The ICC held in favor of GTE on the discrimination charge, finding petitioners had not met their burden of proving the rates were discriminatory. In our view, once it is shown that one group of consumers is paying more than another group for the same service, the burden of proof should shift to the utility to prove that its rates are nondiscriminatory and cost-based. Unfortunately, controlling legal precedent places the burden upon the petitioners to prove that the rates are discriminatory. Because petitioners did not have access to GTE's cost data, they were unable to meet this burden. Accordingly, we must affirm.

## FACTS

A brief history of GTE's proceedings before the ICC is necessary to fully understand the circumstances surrounding this appeal. In 1976, GTE was authorized by the ICC to conduct a local measured service experiment to obtain consumer reaction to paying for local service on a measured basis as compared to the flat-rate method then in place. Following the experiment, in 1982 GTE sought and received ICC approval to begin replacing its flat-rate service with usage-sensitive service. From 1982 until 1986, GTE continued to convert its exchanges as approved.

In 1986, CUB filed a complaint with the ICC, alleging that GTE's usage-sensitive service rates violated the Public Utilities Act (Illinois Act or Act) (220 ILCS 5/1—101 *et seq.* (West 1998)) because the rates lacked cost justification and were unreasonable and discriminatory. Although the ICC determined that GTE's rate structure did not optimally reflect its underlying costs, the ICC ultimately concluded that CUB had not met its burden of proof as to the rates being unjust and unreasonable. See *Citizens Utility Board v. GTE North, Inc.*, Ill. Com. Comm'n, No. 86—0286 (September 7, 1989). During the course of the proceedings in Docket No. 86—0286, GTE made known its intention to further expand usage-sensitive service. As part of its deci-

sion in Docket No. 86—0286, the ICC ordered GTE to submit cost/benefit analyses when it filed tariffs to expand usage-sensitive service into other areas. The analyses were to include data concerning the incremental cost of billing and capacity savings associated with usage-sensitive service.

In 1994, GTE requested authority to continue the process of conversion from flat-rate to usage-sensitive service. GTE represented to the ICC at that time that the usage-sensitive service rates were intended to be revenue neutral to its flat rates. The ICC approved GTE's request subject to GTE's compliance with the ICC's order in Docket No. 86—0286. See *GTE North, Inc.*, Ill. Com. Comm'n, No. 94—0041 (October 11, 1994).

As of the ICC's order in this case, GTE had converted 384 of its 523 exchanges to usage-sensitive service. The usage-sensitive service rates in effect for residential consumers at the time of the ICC's order are as follows:

| RATE ELEMENT | CLASS A (Urban) | CLASS B (Rural) |
|---|---|---|
| Access Charge | $15.99/month | $16.99/month |
| Extended Area Service Charge (Peak) | $0.04/call $0.02/minute | $0.04/call $0.02/minute |
| Home Calling Area Charge (Peak) | $0.04/call | $0.04/call. |

## PETITIONERS' ARGUMENTS AND EVIDENCE

This case results from two complaints, the first filed by individual consumers, the second filed by CUB. The individual consumers charged that GTE's home calling areas in rural exchanges were unreasonably small. A home or untimed calling area is the geographical region in which a telephone service consumer under usage-sensitive service pays solely a connection charge to call other phones in that area, as opposed to an extended-area service for which she pays a connection and a per-minute charge (see chart above). According to the consumers, the geographically small home calling areas in rural locales were producing high local rates that were not revenue neutral to GTE's prior flat rates for local service in violation of the ICC's previous orders. Likewise, CUB petitioned the ICC to revise GTE's usage-sensitive service rates to insure that the usage-sensitive service revenues were equal to the flat-rate revenues that they replaced. Thus, the consolidated complaints requested that the extended-area service rates in rural areas be changed from rates having a connection charge and a per-minute charge to a single rate having only a connection charge, currently $0.04 per call.

Testimony and other evidence of over 50 consumers and a petition signed by over 9,500 consumers were submitted to the ICC. This evidence recounted the purported increases in individual consumers' telephone bills occurring after the implementation of usage-sensitive service. Among other complaints, the consumers stated that (1) extended-area service charges made Internet use prohibitively expensive; (2) their families were restricted in calling their local schools and their children's classmates; (3) older people were becoming more isolated due to fear of incurring large telephone bills; and (4) essential services such as medical facilities and stores were beyond their untimed calling zone.

Petitioners also elicited the opinion testimony of William Dunkel. Dunkel is a former ICC staff member and a telecommunications expert who has consulted on telephone issues since 1980 and testified in over 130 regulatory proceedings nationwide. He stated that GTE's usage-sensitive service rates discriminated against rural consumers in violation of section 254(b) of the Telecommunications Act of 1996 (Federal Act) (47 U.S.C. 254(b) (Supp. 1996)). He also testified that GTE's usage-sensitive service revenues vastly exceeded the flat-rate revenues that they replaced.

Dunkel analyzed billing data for three particular exchanges and reported revenue increases of $5.75, $6.62 and $9.07 per line per month. He further reported that business revenues for the three exchanges increased by $3,284, $3,824 and $4,190 per line per month. According to Dunkel, an expanded look at the conversion showed that GTE's average increase in revenues was $3.71 per line per month. The sum total added up to a $34 million-per-year increase in revenue for GTE.

Dunkel also reviewed revenue data submitted by GTE and stated that for a particular group of exchanges GTE had underreported its revenue by over $100,000. In this regard, Dunkel noted that GTE had not filed any cost/benefit analyses that were required by the previous ICC orders and that the revenue documentation submitted by GTE was based on forecasted data instead of comparisons of actual billing data that was available to GTE at the time it filed its revenue reports. Petitioners alleged that the documentation submitted by GTE was incomplete and unreliable.

Finally, Dunkel stated that GTE's implementation of usage-sensitive service rates resulted in far fewer lines in rural untimed calling zones as opposed to urban untimed calling zones. Unlike Ameritech, GTE limits its untimed calling zones to one exchange. Thus, Bloomington, for example, has an untimed calling zone that includes approximately 69,000 lines, whereas 70% of the class B (rural) ex-

changes have fewer than 1,500 lines and 28% have fewer than 500 lines. Dunkel maintained that GTE provided no cost basis for limiting untimed calling zones to one exchange in rural areas. Accordingly, Dunkel recommended that the extended-area service areas, already designated by the ICC to be within the community of interest for rural exchanges, be included within the untimed calling areas.

Barbara Tanzyus, a statistician, also offered opinion testimony on behalf of petitioners. It was mostly upon her study that Dunkel's testimony and analysis were based. Among other things, Tanzyus contended that the average size of a class B (rural) exchange was 61 square miles, whereas the average size of a class A (urban) exchange was 120 square miles.

## GTE'S ARGUMENT AND EVIDENCE

GTE's central argument is that the petitioners did not meet their burden of proof in order to justify rezoning the rural calling areas. In other words, petitioners did not show that GTE's rate structure was so unrelated to cost that GTE was guilty of discrimination against its rural consumers. GTE conceded that the conversion from flat-rate to usage-sensitive service was not revenue neutral. But, GTE maintained that the revenue gain was approximately 2.4% and that the ICC's previous orders did not make revenue neutrality a condition of continued usage-sensitive service expansion.

In particular reference to petitioners' arguments and proposed remedy, GTE contended that the remedy sought by petitioners would violate the prohibition against single-item rate-making. See *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 585 N.E.2d 1032 (1991). The remedy would also be inappropriate because the proceedings before the ICC did not involve other interested parties whose participation was necessary to assess the potential industry-wide impact that would flow from such a change. As to petitioners' claim concerning GTE's failure to file cost/ benefit analyses, GTE retorted that it had been filing for tariffs to expand usage-sensitive service in this manner with the ICC for several years, apparently without the ICC complaining about the absence of cost/benefit data.

## STAFF'S POSITION

Pursuant to the ICC's rules of practice (83 Ill. Adm. Code Part 200 (1996)), the staff of the ICC (Staff) played an integral part in the proceedings below. Staff stated that "revenue neutrality" meant that GTE should receive the same amount of profits under usage-sensitive service as it did under the flat-rate system. When usage-sensitive service was introduced, its projected revenue was developed assuming

that usage would decrease because consumers would become more conscious of their talk time. An increase in usage time since 1994 is one factor contributing to the increased revenues realized by GTE since usage-sensitive service conversion.

Staff maintained that GTE was required to supply cost/benefit analyses for each wave of usage-sensitive service conversions and such analyses were to include a usage-demand analysis, data concerning the incremental cost of billing and data showing the capacity of the realized savings. Staff claimed that GTE admitted to not supplying any cost/benefit analyses since the ICC orders in Docket Nos. 93—0301 and 94—0041 (1994). As a result, Staff has not been able to properly examine the effect of usage-sensitive service expansion on revenue since the last rate case, which occurred in 1994. Based on a limited amount of data provided by GTE, Staff concluded that there was no revenue increase associated with class A (urban) consumers or class B (rural) business consumers. But, a revenue increase of 4.46% or $2,018,117.02 was experienced with class B (rural) residential consumers. Staff later stated that, due to inaccuracies in the GTE data, the revenue increase was probably higher.

Staff recommended that a per-call option be instituted for residential consumers for extended-area service calls. According to Staff, this remedy would address the revenue increase without unduly burdening GTE, as would be the case if extended-area service was abolished or a general rate case was ordered. Staff suggested the per-call option be set at $.15, which would in theory result in a $2,468,275.13 decrease in revenues.

Staff further stated that residential rates are required to pass an imputation test pursuant to section 13—505.1 of the Act. 220 ILCS 5/13—505.1 (West 1998). The imputation test is used to calculate the cost of the noncompetitive aspects of the services offered by the telephone company. Staff initially calculated the total imputed cost for the exchanges at issue to be $.073 per call. In response to additional data submitted by GTE, Staff raised the estimate to $.107 per call. Thus, Staff reasoned that the per-call option could drop to $.107 per call without failing the imputation test. In response, petitioners argued that, because untimed calls are excluded from the imputation test under section 13—505.1, the extended-area service rate that Staff proposed should not be subjected to the imputation test. Petitioners accordingly maintained that the rate should be $.04 per call.

Staff did not accept petitioners' reasoning in this regard but instead recommended that it monitor GTE for one year to get a more accurate view of the effect of usage-sensitive service conversions on GTE's revenue. As part of the supervision, GTE would be required to

submit monthly cost/benefit data regarding each service that comprises flat-rate calling, usage-sensitive service calling and per-call option calling. At the end of the year period, Staff, if necessary, would institute a full investigation into GTE's usage-sensitive service rate structure.

In response to petitioners' arguments and recommendations, Staff stated that petitioners' calculations were flawed, in particular the alleged $34 million increase in revenues as a result of usage-sensitive service. Staff maintained that petitioners errantly took averages from different sets of data to arrive at their estimated revenue-per-line increase. Staff also echoed the contentions of GTE concerning petitioners' failure to shoulder their burden of proof on the discrimination issue. In this vein, Staff stated that petitioners failed to show that the difference between the rates of rural and urban consumers was not attributable to the costs of providing those services.

## ICC'S DECISION

The ICC determined that the petitioners had not shown that the extended-area service rates currently in place lacked a reasonable relationship to the costs of providing those services. The ICC further found that the revenue increase attributable to usage-sensitive service would likely well exceed the Staff's $2 million estimate. Therefore, the ICC implemented an untimed extended-area service rate set at $.11 per call, relying on the imputed cost of $.107. However, the ICC also found that the documentation submitted by GTE was incomplete and unreliable. Consequently, the ICC ordered that GTE file the monthly data reports requested by Staff. The period of surveillance was shortened to six months to enable Staff to initiate an investigation earlier if such action was warranted.

Petitioners appeal.

## SCOPE OF REVIEW

■ On appeal from an ICC order, this court's review is limited to considering whether: (1) the ICC acted within its authority; (2) state or federal constitutional rights have been infringed; (3) the decision is supported by substantial evidence; and (4) adequate findings were made to support the decision. *Citizens United For Responsible Energy Development, Inc. v. Illinois Commerce Comm'n*, 285 Ill. App. 3d 82, 673 N.E.2d 1159 (1996). The ICC's findings and conclusions regarding factual questions are to be held *prima facie* true, and ICC rules, orders and decisions are to be considered *prima facie* reasonable. *People ex rel. O'Malley v. Illinois Commerce Comm'n*, 239 Ill. App. 3d 368, 606 N.E.2d 1283 (1993).

## ANALYSIS

■ The central issue of this appeal is whether GTE's rate scheme

discriminates against its rural consumers. In order to prove that the rate scheme is discriminatory, it was necessary to show that the rates charged to rural consumers are not based on the costs of providing services to them. Having carefully reviewed the record, it is readily apparent that there is no cost data within the record with which such a charge could have been proven. As a consequence, the resolution of this appeal turns on our determination of which party bore the burden of proof with regard to the discrimination claim. If GTE bore the burden of justifying its rate scheme as cost-based, then the lack of evidence in the record would require that we reverse and remand in order that GTE might do so. If petitioners bore the burden, then we must affirm.

The ICC squarely placed the burden of proof upon petitioners. Placing the burden of proof of a discrimination claim under the Act on the petitioner is an action that is countenanced by our supreme court. See *City of St. Charles v. Illinois Commerce Comm'n*, 21 Ill. 2d 259, 172 N.E.2d 353 (1961); *City of Chicago v. Illinois Commerce Comm'n*, 15 Ill. 2d 11, 153 N.E.2d 574 (1958); *Chicago & Eastern Illinois Ry. Co. v. Commerce Comm'n*, 343 Ill. 117, 175 N.E. 8 (1931). As a result, we are obligated by this supreme court precedent to affirm the ICC decision in the case at bar. Because of the inequity of this result, however, we invite the court or the legislature to reconsider the issue.

With regard to this case, it is undisputed that GTE was commanded in previous ICC docket orders to provide cost/benefit data concerning its conversion from flat-rate service to usage-sensitive service. It is equally unquestioned that GTE has failed to do so since the ICC orders in Docket Nos. 93—0301 and 94—0041 (1994). Moreover, the evidence presented to the ICC showed that, from a geographical and community-of-interest perspective, rural consumers are paying more than their urban counterparts under GTE's new usage-sensitive service rate regime. Despite the apparent lack of a cost justification for charging rural consumers more than urban consumers, the ICC allowed GTE to continue with its present rate schedule as GTE proceeds with the changeover from a flat-rate system to usage-sensitive service. While the ICC did order GTE to offer an $.11 flat-rate option for usage-sensitive service calling areas, that rate is still $.07 higher than the home calling area rate.

In our minds, GTE should be forced to justify its rate schedule as cost-based. GTE, as opposed to petitioners, is in possession of all of the information necessary to determine what its costs are with regard to providing local service to rural consumers. Moreover, GTE has the financial wherewithal to produce such a cost study. It is even possible that the cost/benefit analyses that GTE was ordered, but failed, to pro-

duce in previous docket orders would have contained the type of information necessary to demonstrate the cost-basis for its rate schedule. Despite these facts, no cost information was released by GTE. In cases such as this, when it is apparent that a group of consumers is paying more than another group for the same type of services, we believe that the burden should be on the utility to prove that its rates are cost-based and nondiscriminatory. In addition to being steeped in common sense, this conclusion is also supported by federal case law involving orders of the Federal Communications Commission (FCC), a regulatory body vastly similar to the ICC.

Like the FCC, the ICC is an administrative agency whose power is derived from the legislature. See *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n,* 146 Ill. 2d 175, 585 N.E.2d 1032 (1991); *Connecticut Office of Consumer Counsel v. Federal Communications Comm'n,* 915 F.2d 75 (2d Cir. 1990) (FCC). While the ICC has "general supervision of all public utilities" in Illinois (220 ILCS 5/4—101 (West 1998)), the FCC has the same type of authority over telecommunications utilities in the federal realm (47 U.S.C. § 152 (1982)). In particular reference to rates, the ICC has broad regulatory power over intrastate telecommunication rates within Illinois. 220 ILCS 5/4—101 (West 1998). So too, the FCC has equally wide-reaching authority over the formulation of rates for interstate telephone calls. See 47 U.S.C. §§ 152, 201(b) (1994).

Under the Public Utilities Act and the Telecommunications Act of 1996, the rates permissibly charged by a telecommunications company are based in part on the operating costs incurred by the company in providing the telephone service. See *Citizens Utilities Co. v. Illinois Commerce Comm'n,* 124 Ill. 2d 195, 529 N.E.2d 510 (1988) (intrastate telephone services); *Connecticut Office,* 915 F.2d at 76 (interstate telephone services). Furthermore, the Federal Act provides that "it shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges *** for *** like communication service." 47 U.S.C. § 202(a) (1994). Likewise, under the Public Utilities Act, an Illinois utility company cannot "establish or maintain any unreasonable difference as to rates or other charges *** as between localities or as between classes of service." 220 ILCS 5/9—241 (West 1998). Given this affinity between both the regulatory bodies and the statutes under which each operates, we believe that reviewing federal cases involving the FCC can inform our analysis of ICC cases involving the Public Utilities Act.

When a claim of rate discrimination is brought to the FCC under the Federal Act, the FCC, and on review the federal court, undertakes a three-tiered inquiry for determining whether the utility's rates are

in fact discriminatory. See *MCI Telecommunications Corp. v. Federal Communications Comm'n*, 917 F.2d 30 (D.C. Cir. 1990). The first two steps involve proof by the petitioner that (1) the service provided to him is similar to the service provided to another and (2) there is a price difference for this "like" service. *MCI*, 917 F.2d at 39. Once the petitioner has fulfilled the first two steps, the burden shifts to the utility to justify the price disparity as reasonable. *MCI*, 917 F.2d at 39; see also *Western Union International, Inc. v. Federal Communications Comm'n*, 568 F.2d 1012 (2d Cir. 1977). The burden is shifted to the utility to prove the rate is reasonable because discriminatory rates can be " 'approved only when an extraordinarily important and serious interest of the carrier is involved.' " *Trailways of New England, Inc. v. Civil Aeronautics Board*, 412 F.2d 926, 932 (1st Cir. 1969), quoting *Frontier Teachers Tariff*, 39 C.A.B. 615, 619 (1964).

The approach used by the FCC in discrimination cases is akin to the model used by courts in employment law discrimination cases. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). Adopted by our supreme court in *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 545 N.E.2d 684 (1989), the three-step inquiry for employment discrimination claims also informs our analysis here, providing additional rationale for why the burden should be shifted to the utility to validate its rate schedule.

Under the employment discrimination model, the plaintiff must first establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. *Zaderaka*, 131 Ill. 2d at 178-79, 545 N.E.2d at 687. Upon the demonstration of a *prima facie* case, a rebuttable presumption arises that the employer unlawfully discriminated against the plaintiff.[1] *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687. Second, the employer must articulate a legitimate, nondiscriminatory reason for its employment decision in order to rebut the presumption of discrimination. *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687. If the employer is able to do so, to prevail in his claim the plaintiff must prove by a preponderance of the evidence that the employer's articulated reason is a pretext for unlawful discrimination. *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687.

This analysis has been imported outside the employment law arena

---

[1]The burden that shifts to the employer is therefore called the "burden of production." *Burdine*, 450 U.S. at 255-56, 67 L. Ed. 2d at 216-17, 101 S. Ct. at 1095. The ultimate burden of proof remains at all times with the employee. *Burdine*, 450 U.S. at 253, 67 L. Ed. 2d at 215, 101 S. Ct. at 1093.

to cases dealing with discrimination in housing (see *Szkoda v. Human Rights Comm'n*, 302 Ill. App. 3d 532, 706 N.E.2d 962 (1998)) and to cases involving discrimination against debtors in bankruptcy cases (see *Whitaker v. Philadelphia Electric Co.*, 84 B.R. 934 (Bankr. E.D. Pa. 1988)). While the analysis is in part motivated by the desire to help remedy animus regarding race, sex and class (see *National Communication Ass'n v. AT&T Corp.*, No. 92 Civ. 1735 (S.D.N.Y. 1998) (rejecting the employment discrimination model because there was no claim that the group of ratepayers alleging discrimination was disliked by the utility)), it is also driven by the difficulty faced by plaintiffs when attempting to prove claims of discrimination resulting from such animus because direct evidence of discrimination hardly ever exists. See R. Belton, *Burdens of Pleading and Proof in Discrimination Cases: Toward a Theory of Procedural Justice*, 34 Vand. L. Rev. 1205, 1229 (1981). The same type of difficulty is faced by petitioners here. Without the benefit of a cost study, which would have been the only possible source for direct evidence of discrimination, petitioners, like the plaintiffs in employment discrimination cases, had to attempt to prove their claim of discrimination with circumstantial evidence. In such cases, we believe the burden should shift to the utility, as it does under the federal law and as it does to the employer in the employment law context. The utility should be forced to demonstrate why its rate disparity is reasonable. Unfortunately, we are bound by precedent that holds the contrary to be true.

■ Our resolution of this central issue is dispositive of the appeal. Under the present state of the law, petitioners were required to produce evidence that GTE's rates were not cost-based in order for their cause to succeed. They did not. Accordingly, further discussion is unnecessary.

For the reasons stated above, the judgment of the Illinois Commerce Commission is affirmed.

Affirmed.

HOMER, J., concurs.

JUSTICE KOEHLER, specially concurring:

I concur in the judgment. I agree that our supreme court precedent compels us to affirm the Illinois Commerce Commission's decision; however, the majority's opinion's further discussion is of no legal effect and unnecessary to our disposition of this case.